LARRY T. DURBIN, Plaintiff-Appellee, v. ST. LOUIS SLAG PRODUCTS COMPANY, INC., Defendant-Appellant and Third-Party Plaintiff-Appellant (M-R Construction Company, Inc., Third-Party Defendant-Appellee).

Fourth District No. 4—90—0292

Opinion filed December 12, 1990.

Kehart, Shafter & Hughes, P.C., of Decatur (Michael J. Kehart and Albert G. Webber, of counsel), for appellant.

Frank H. Byers II, of Byers & Byers, Ltd., of Decatur, for appellee Larry Durbin.

Deborah L. Rose, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Springfield, for appellee M-R Construction Company.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff Larry T. Durbin recovered an $82,875 judgment against the defendant, St. Louis Slag Products Company, Inc. (St. Louis Slag), in a personal injury action stemming from a tractor-trailer accident at a construction site in Pana. In a contribution action filed by

St. Louis Slag against M-R Construction Company (M-R), the jury determined M-R was 15% negligent in causing the accident. St. Louis Slag raises the following issues on appeal: (1) plaintiff failed to prove that St. Louis Slag owed a duty to plaintiff and failed to prove St. Louis Slag breached that duty; (2) the jury verdict is against the manifest weight of the evidence; (3) plaintiff's actions prior to the accident constituted an independent, superseding cause of plaintiff's injuries; (4) the contribution verdict is against the manifest weight of the evidence; (5) the conduct of jurors was prejudicial to St. Louis Slag; and (6) the trial court erred in finding St. Louis Slag waived an issue on the jury instructions. We affirm.

Plaintiff testified that in 1983 he was a coowner of a semitrailer truck with a dump trailer. Plaintiff principally used his truck to haul crushed rock. The dump trailer was a 20-foot-long Fruehauf which was bathtub shaped. It was 11 feet high and 8 feet wide with a capacity to hold 22½ tons. There was a tailgate at the back of the trailer which was operated by a switch located on the left side of the tailgate. The dump trailer was connected to the tractor by means of a device known as a fifth wheel. A fifth wheel is a horseshoe-shaped plate located behind the tractor cab and above the tractor's rear axle. The trailer is attached to the fifth wheel by inserting the kingpin on the trailer into a slot in the center of the fifth wheel. The surface of the fifth wheel is greased to allow for a pivoting motion. The pivoting motion allows a tractor trailer truck to turn corners. There is also a forward and backward motion in the fifth-wheel assembly.

Plaintiff testified his dump trailer had a dump pump and was raised by a power takeoff unit which included a single hydraulic mast or cylinder in the front of the trailer. The mast was controlled by a lever inside the tractor cab. The mast extended up in a telescope fashion and, when fully extended, stood approximately 28 feet high.

On August 26, 1983, plaintiff was hauling crushed rock known as CA6 from Specification Stone, a quarry located outside of Pana and owned by St. Louis Slag, to a construction site in Pana where a Walmart store was under construction. The CA6 was to be used as a base for the parking lot for Walmart, which was being constructed by M-R. CA6 is an aggregate substance containing rocks approximately 1 to 1¼ inches in size and dirt. CA6 is also called road pack and is used as a base for concrete and asphalt in road construction because it packs very hard and makes a good surface. Plaintiff testified he followed the customary procedure for receiving a load at the quarry when he arrived at Specification Stone. He drove into the quarry, obtained an empty weight for his whole rig, backed up to a pile of rock,

and waited for an end loader to fill his trailer. The end loader is a tractor which digs CA6 out of a large pile. While being loaded with rock, plaintiff remained in his truck.

At 6 a.m. on August 26, 1983, plaintiff arrived at Specification Stone to receive his first load of CA6. Plaintiff recalled the weather on August 26 was warm, with a calm wind. Plaintiff stated it took approximately 1½ buckets from the end loader to fill his trailer with 22½ tons of rock. After receiving the load, plaintiff proceeded to the scale house at the quarry to get weighed. After receiving a weight ticket, plaintiff traveled on several back roads to the Walmart construction site. Plaintiff stated it was not usual or customary for drivers to get out of their cab to check their load before leaving the quarry. Plaintiff stated that often a truck driver on the road may see the unbalanced load of another driver and advise him by radio of the problem. Plaintiff stated it was customary for truck drivers to rely on the person operating the end loader to get the load in the center of the trailer.

Plaintiff received four to five separate loads of CA6 from Specification Stone on August 26, 1983. Each load was loaded by the same person, Walter "Putt" Scott, and was delivered to the Walmart site. Plaintiff testified he unloaded the first four loads at the site using a method known as tailgating. When a load is tailgated, the truck driver gradually raises his dump trailer while he drives along a specified path, spreading out the material as it falls from the back of the trailer. Plaintiff testified tailgating a load is very common if the area where you are unloading is graded and level for a distance and there are no holes which could cause shifting in the trailer. Plaintiff stated that since there is a concern when tailgating that the truck may tip over, he often had a supervisor watch the trailer while dumping to make sure it was straight and not rocking. Plaintiff also stated he usually visually inspected the area to make sure it was level before tailgating a load. Plaintiff stated he was directed by M-R's site supervisor, Ernest Mountjoy, to tailgate dump the first four loads of CA6 he delivered to the site. Mountjoy watched plaintiff's truck while he tailgated his first four loads. Plaintiff had no problems unloading the first four loads of CA6.

Plaintiff stated his last load of CA6 was also loaded by Scott. Plaintiff stated a load of CA6 does not shift in the trailer en route to the ultimate location, although it may settle somewhat. Plaintiff stated his last load was loaded from the right side. Plaintiff recalled the first bucket of this load went into the trailer very hard and fast and shook his whole rig violently. Plaintiff stated his whole rig has

air-ride suspension, which levels the ride within 30 seconds after a load of rock is received. Plaintiff left the quarry after receiving the last load and drove the same route to the Walmart site. En route, plaintiff stated nothing unusual occurred and, because of his air-ride suspension, plaintiff could not tell whether the load was off center.

When he arrived at the site, Mountjoy told plaintiff he did not need any more CA6 tailgated. Mountjoy told plaintiff to dump his last load on the west side of the Walmart building near where a pile of rock had previously been dumped. Plaintiff stated there were a lot of utility vehicles parked on the west side of the building so he backed his trailer up to the rock pile at an angle. Plaintiff testified that since many construction sites do not allow enough room for the dumping of rock from a trailer parked in a straight line, he often dumped a load of CA6 at an angle or in a jackknife position. When dumping at an angle, plaintiff testified there is often a supervisor to watch the dumping. Plaintiff further testified it was common to unload a trailer at an angle so long as the surface was level and hard.

Plaintiff testified the area on the west side of the building was graded and he got out of his cab and checked the ground to make sure it was level. Plaintiff then released the tailgate and got back into the cab to begin raising the trailer bed by the power-takeoff unit inside the cab. As the trailer bed began to rise, plaintiff watched the trailer from his driver's side mirror. The trailer was at a 40-degree angle with the tractor cab. The trailer was going up very slowly when plaintiff felt the trailer start to lean to the driver's side very rapidly. Plaintiff estimated the trailer was only at the second stage in the lifting process and approximately 8 to 10 feet off the trailer frame when the trailer tipped over onto the driver's side. Because of the angle between the trailer and the tractor cab, the trailer fell and crushed the tractor cab. Plaintiff stated the fifth wheel was not damaged in the accident. Plaintiff suffered multiple injuries in the accident.

On cross-examination by St. Louis Slag, plaintiff stated he never took any truck-driving classes or courses but gained his experience as a truck driver by following and watching other experienced truck drivers. At the time of the accident, plaintiff had been driving a truck for two to three years. Plaintiff stated that experienced drivers told him that if he ever dumped a load in a jackknife position, he had to use extra caution. Plaintiff stated the trailer had a caution sign attached to the front of it which stated that the frame rails had to be in a straight line when the trailer bed was raised to dump a load. Plaintiff admitted that when dumping in a jackknife position, a driver had to be more cautious and make sure the tractor and trailer were on

flat, level and hard ground. Plaintiff further stated that if a tractor and trailer are not on a level surface, the trailer could tip over. Also, when a load is loaded off-center, that could cause a trailer to tip over.

Plaintiff stated he did not get out of the cab to check the last load received at the quarry, although he could have and had done so in the past at least two to three times a month. Plaintiff stated that to the best of his knowledge and based on his experience in the trucking business, loads received at quarries are always centered. The load may be placed a little forward or backward in the trailer but from side-to-side it is centered. Plaintiff stated it is not unusual to receive a load that was not centered from side-to-side and a driver could reject an off-centered load at the quarry and ask that it be reloaded. Plaintiff also stated it was not normal procedure to reject a load at the quarry.

Plaintiff stated he was directed by Mountjoy to dump the last load on the west side of the building but he could have refused to dump there or asked that some of the trucks and materials on the west side be moved. Plaintiff stated he was paid on a percentage basis and the more loads he hauled the more money he made. Plaintiff stated the way he unloaded the last load was the fastest way to unload it. Plaintiff did not recall how wet or dry the loads of CA6 were on August 26, 1983, because he did not check the loads. Plaintiff stated no one was watching him dump his last load and, had someone been watching, he would have known sooner that the trailer was going to tip over.

On cross-examination by M-R, plaintiff stated the accident occurred within 5 to 10 seconds after he began raising the trailer bed. Plaintiff stated someone watching on the ground would have seen the problem in time to prevent it. Plaintiff stated that because the Walmart site was a union job, someone should have been supervising his load while he was unloading. Plaintiff also stated he could have asked for someone to supervise the unloading but he recalled everyone was busy that day laying concrete for the parking lot. Plaintiff stated that he knew unloading in a jackknife position was unstable, but if the ground was hard and level, unloading was not a problem.

Walter "Putt" Scott testified as an adverse witness for plaintiff. Scott stated he loaded plaintiff's dump trailer with CA6 rock each time he came into the Specification Stone quarry on August 26, 1983. Scott stated the CA6 was wet that day because it had been raining for a couple of days. Scott stated the last load started to roll out of the bucket but then broke loose and slipped into plaintiff's trailer. Because the CA6 was wet on August 26, it was sticking to the bucket

and it fell hard into the plaintiff's trailer. Scott stated he tries to put a load in the center of a trailer and watches the material coming out of a bucket so he can adjust the load to center it. Scott tells a driver when he gets a load off-center, which occurs about once a month.

When cross-examined by St. Louis Slag, Scott stated drivers tell him when a load is off-center and when they want it reloaded. Scott also stated drivers check their loads sometimes before leaving the quarry. On cross-examination by M-R, Scott stated it was customary at Specification Stone for drivers to check their load before leaving the quarry.

H. Bolter Kelsey, a mechanical engineer, testified for plaintiff. Kelsey stated the cause of plaintiff's accident was an off-center load which shifted as the trailer bed was elevated. The shift in the load twisted the trailer frame, which caused plaintiff's truck to tip over. Kelsey explained that the hydraulic mast is mounted to the trailer, not to the tractor. The twisting force due to the off-center load originated in the mast and was then transmitted to the rear of the trailer where there are two pivot points which absorb most of the twisting force. Whatever twisting force is not absorbed by these pivot points is then transmitted first to the rear of the trailer frame, then up the frame to the front of the trailer frame and the fifth wheel. Kelsey stated the pictures of the overturned truck showed that the trailer bed was elevated to 10 feet when it fell over, indicating the imbalance in the load was significant. Kelsey stated the angle of plaintiff's tractor and trailer was of no particular significance to the tip-over of the trailer. Kelsey stated plaintiff's whole rig would have tipped over if he had been parked in a straight line. According to Kelsey, plaintiff's load of CA6 was wet on August 26, 1983, and it was loaded more to the left of the trailer bed at the quarry. Because plaintiff testified the load fell in "hard" on August 26, Kelsey opined it remained on the left side of the trailer bed and nothing was loaded by the bucket on the right side to balance the load. If the operator of the end loader was watching at the quarry, he would have seen where the load ended up in the trailer bed.

Kelsey stated the "caution" sticker on plaintiff's trailer directs that the trailer should be level from one side to the other and has nothing to do with the angle between the tractor and the trailer. Kelsey admitted that it was more stable to have a tractor and trailer in a straight line while dumping and that dumping while jackknifed was not the best practice. Kelsey stated that if plaintiff had checked his load before leaving the quarry on August 26, he would not have been able to tell whether it was level because the top layer of CA6 would

not reflect how uneven the bottom layer of CA6 was.

On cross-examination, Kelsey stated he never worked as a truck driver but only drove trucks for testing purposes. Kelsey also stated he had only seen plaintiff's truck in the pictures introduced at trial. Kelsey also had never been involved in a case like plaintiff's before. Kelsey did not visit the Specification Stone quarry and had never worked in a quarry. Kelsey admitted that perfect balance can never be achieved in loading CA6 and stated that the drivers he was familiar with did not check their loads but relied on the operator of the end loader to center and balance the load at the quarry. Kelsey stated the pictures of plaintiff's truck indicated the rear of the trailer moved sideways during the fall. Kelsey stated if the tractor trailer was parked in a straight line, the trailer would not have crushed the tractor when it fell. Kelsey stated there were only two reasons why plaintiff's rig fell over: the load was unbalanced or the ground under the rig was not level. Kelsey opined the angle between the trailer and the tractor before the accident was approximately 40 to 45 degrees. Kelsey admitted there is more stability when a load is dumped with a tractor and trailer in a straight line. Kelsey stated plaintiff's load was loaded more to the left and the front of the trailer. While there was no direct evidence of an unbalanced load, Kelsey maintained the physics of the situation indicated that plaintiff's trailer tipped over because the load was unbalanced.

With regard to the fifth-wheel assembly, Kelsey stated that if the trailer and tractor were at a 90-degree angle, the fifth wheel still had 90% of its ability to resist the twisting force in the trailer. Further, if there was enough twisting force and the angle was great enough, there would have been some movement in the fifth wheel which contributed a little to the instability of the load. According to Kelsey, the fifth wheel had little to do with dumping a load; it moves front to back and there is little movement from side to side. Kelsey disagreed with the opinion of defendant's expert that the angle at which plaintiff was parked to dump caused the movement in the fifth wheel.

With regard to the use of a dump master, Kelsey stated this person guides a trailer and watches the load to see if there is any movement in the trailer. In this case, a dump master would have seen movement in the rear of the trailer before plaintiff did and could have told plaintiff to stop raising the trailer bed. Kelsey stated the obligation to provide a dump master is with the person or company in charge of the jobsite. Kelsey testified that if a dump master had been used in this case, it was highly unlikely the accident would have happened.

On cross-examination by M-R, Kelsey admitted that dump masters are not used at all dump sites and that a dump master should be someone who knows what to watch for, "not some kid off the street." Kelsey also stated that independent drivers like plaintiff do not always know whether a supervisor or dump master will be present at a dump site. Kelsey testified that someone like plaintiff with experience dumping his rig would be helpless without a dump master, given the unbalanced load. While neither a driver nor a dump master would know when a load was unbalanced by looking at it, a dump master would be in a position to observe the shifting of the trailer as the bed was raised due to an unbalanced load. Kelsey stated it was his experience that a dump master was only used when there was a contract between the parties calling for one.

On redirect, Kelsey stated that because CA6 was wet on August 26, it stuck to the trailer bed, and this supported his conclusion that the load was unbalanced and the imbalance caused the rig to tip over. Kelsey stated the majority of the ability of a tractor trailer to resist a tip-over is contained in the trailer itself. After placing the tractor at a 40-degree angle with the trailer, the fifth wheel still had 96% of its ability to resist the twisting in the trailer.

Scott was called as a witness for St. Louis Slag. Scott had been working as an operator of an end loader for Specification Stone for 20 years at the time of trial. Scott stated he tries to position a load based on the axle load limit and tries to center a load, although it is impossible to perfectly center and balance a load. Scott stated it is common practice for a driver to be allowed to have a load redone if he wanted to. Scott stated he does not know a driver's destination with a load unless the driver tells him. Also, he does not know how a driver is going to dump a load from his quarry. Scott did not know the plaintiff's destination or how plaintiff was to dump his load of CA6.

Scott stated the CA6 was wet on August 26. This was not uncommon and all truckers knew CA6 is often wet. Scott stated plaintiff's last load dropped into his trailer hard because it was wet. Scott stated that when CA6 drops into the trailer hard, it drops into the middle of the trailer. Scott stated the last load from plaintiff looked good and was as balanced as any other load would be. Scott stated plaintiff did not ask him to reload after receiving the load but went to the scales to get weighed.

On cross-examination by plaintiff, Scott stated his job was to try to get a load centered and balanced and he has to watch a load as it comes out of the bucket to see if it is centered. On redirect, Scott

stated he watches every load and he recalled plaintiff's load was a good load. On re-cross-examination, Scott admitted that in a pretrial deposition, he stated that he did not recall whether plaintiff's last load slid out or rolled out of the bucket of the end loader. On further redirect, Scott testified that whether the load slid or rolled out of the bucket did not affect his opinion that plaintiff's last load was a good load.

Ernest Mountjoy testified as an adverse witness for St. Louis Slag. Mountjoy stated he was the supervisor for M-R at the Walmart site. M-R had a contract with the owner of the Walmart site to put in a parking lot. Mountjoy had been in the concrete construction business for 40 years. Mountjoy testified he asked that all the loads of CA6 on August 26, 1983, be pile-dumped, not tailgated. Mountjoy had never seen tailgate dumping done on any parking lot he had worked on. Mountjoy stated the parking lot at the site was graded before any CA6 was delivered that day but it had some slope to it to allow for drainage.

Mountjoy stated plaintiff's truck could not have been level where he positioned it to dump the last load. Mountjoy stated the grade lines for the Walmart site indicated there was a two-foot drop downhill in the area where plaintiff was parked to dump the last load. The slope was there for drainage and would have caused a side-to-side slant in plaintiff's trailer. Mountjoy stated the photographs depicting the accident showed plaintiff's tractor was uphill and the trailer was downhill and the trailer fell downhill when it fell over. Mountjoy recalled plaintiff's tractor was at a 90-degree angle with the trailer before the accident. Mountjoy did not recall anyone assisting plaintiff with the unloading of the last load and did not recall having anyone under contract to help with the unloading of CA6. Mountjoy considered plaintiff's jackknife position on an incline to be hazardous because, in this position, a driver does not have the needed stability when the dump trailer is raised up. The position gave plaintiff less control at the fifth wheel. Mountjoy stated he had experience dumping loads from a tractor trailer like plaintiff's and he would have refused to dump in a jackknife position. Mountjoy opined plaintiff's positioning of his tractor and trailer in a jackknife position and the slope in the ground caused the accident and the trailer would probably have tipped over without any load in the trailer bed. Mountjoy stated it is accepted in the trucking industry that every load will have some variance in it because a load cannot be perfectly balanced. Mountjoy stated it was plaintiff's decision to dump his load as he did and the trailer tipped over because of the position it was in. Mountjoy also

stated an unbalanced load could have contributed to the tipping over.

When examined by M-R, Mountjoy stated that M-R's union contract concerning laborers at the site provided for three classifications of laborers: common, semiskilled, and skilled. Mountjoy stated a dumpman is a common laborer used on certain jobs such as dams or hazardous jobs involving dumping over a hill or a bank. Common laborers are not trained. Mountjoy stated he did not believe plaintiff needed a supervisor to watch the unloading of his last load but, had plaintiff asked for one, Mountjoy would have gone himself to supervise the unloading.

On further examination by St. Louis Slag, Mountjoy stated he would not have sent a dumpman because, as a common laborer, a dumpman does not have the skill to help with the unloading of CA6. Mountjoy stated the provision in M-R's union contract requiring one laborer to assist in the unloading of service trucks did not apply to drivers unloading CA6. Further, Mountjoy stated the same provision did not require a dump supervisor at every dump site. Mountjoy testified he had never heard the term "dump master."

Jack Bone testified for St. Louis Slag. Bone had been employed in the trucking business since 1959 and had operated many tractor trailers with a fifth wheel. Bone had also hauled many loads of CA6 and stated, when dumping such a load, a driver had to make sure the trailer was level and in a straight line with the tractor. If parked at an angle to dump, Bone stated the angle should not be more than 1 to 5 degrees and "1 to 2 degrees would be very maximum." Bone stated a load should not be dumped in a jackknife position because "the fifth wheel could hinge," causing the trailer to tip over. On cross-examination, Bone stated he owned a frameless dump trailer.

Richard Bishop also testified for St. Louis Slag. At the time of trial, Bishop had been in the trucking business for over 40 years since his graduation from high school. Bishop had worked for a quarry loading dump trucks and estimated he had hauled and dumped loads of CA6 over 1,000 times. Bishop stated he understood how dump trailers worked mechanically and had investigated approximately one dozen trailer turnovers in the past. Bishop testified one of the turnovers he investigated was caused by an uneven load of material. Bishop stated it was the truck driver's responsibility, after getting a load at the quarry, to inspect a load to insure it was loaded properly. Bishop also stated most good truck drivers check their load. Bishop stated the weight tickets for the loads plaintiff received on August 26, 1983, indicated three out of four of the loads were over the State-set maximum-weight limit.

Bishop testified an end loader operator tries to get a load distributed between the truck axles and tries to balance the load. When CA6 is wet, it falls into a dump trailer instead of flowing in freely. The angle of repose for dry CA6 is one to one; that is, if a pile of CA6 rock is five feet high, then the pile will be five feet wide. When CA6 is wet, the angle of repose is not as consistent. However, Bishop stated that whether CA6 is dry or wet has little to do with whether the trailer is evenly balanced. Bishop stated there was no way to determine whether plaintiff's last load was unevenly balanced. Further, Bishop could not see how the last load could have been loaded so unevenly as to cause the trailer to turn over. Bishop stated uneven ground causes trailers to turn over.

Bishop testified the fifth wheel does not move side to side but only forward and backward and when a tractor trailer is parked in a jackknife position, the trailer gets no support from the fifth wheel. Bishop stated it was not customary for truck drivers to dump their loads in a jackknife position and plaintiff's truck-owner's manual warned that his trailer and tractor should be parked in a straight line when dumping a load. Bishop stated he did not allow his employees to dump while jackknifed because a driver loses all stability and the jackknife position was similar to "standing on a tightrope." Bishop stated that in a jackknife position at a 75- to 85-degree angle, the fifth wheel remains in balance as long as the trailer and tractor are parked on level ground. Where one wheel is lower than the other, the balance is thrown off. Once a load starts to shift off-center, the fifth wheel falls forward as it did in this case, causing the trailer to fall forward.

Bishop stated that when pile-dumping a load, a driver wants to dump the whole load as fast as possible. As the material comes out of the tailgate, a driver often has to pull forward a few feet to unblock the load to allow the rest of the material to fall out of the trailer. In a jackknife position, a driver cannot pull forward to facilitate the dumping. In Bishop's opinion, the cause of the accident was not any imbalance in the load, but the jackknife position plaintiff put his tractor and trailer in to dump. Bishop stated plaintiff's tractor was headed downhill at a slight angle but that was all that was needed to tip over the jackknifed rig. Bishop stated the downslope could have caused plaintiff's load to move while the trailer bed was being raised. As the mast pushed the trailer up, the fifth wheel tilted over on the frame, causing the trailer to tip over rapidly. Bishop stated that if plaintiff had been parked in a straight line, he would not have tipped over. However, had it tipped for some reason, the trailer would not have fallen on the tractor cab and caused plaintiff's injuries. Bishop also

testified the end loader operator exercised skill and care in loading plaintiff's trailer and an imbalance in the load did not contribute to or cause plaintiff's accident.

On cross-examination, Bishop admitted he had testified for defendant's counsel's firm in other cases. On redirect, Bishop stated that he was a witness several years previously in some cases for the law firm representing defendant, but none involved personal injury claims.

Plaintiff testified as an adverse witness for defendant. Plaintiff stated the hydraulic mast extends up in sections and he can feel the trailer move as the mast reaches each succeeding section. When dumping his last load on August 26, 1983, plaintiff stated he felt the trailer move just before it tipped over. Plaintiff stated the mast had probably reached only the second section when it tipped over.

In rebuttal, plaintiff testified the fifth wheel on his tractor is unlike the fifth wheel shown by videotape to the jury. Plaintiff's fifth wheel had blocks welded in front of it to stop the pivot movement from moving as much as the fifth wheel moved in the videotape. Plaintiff stated he was familiar with frameless dump trailers, which have no frame underneath the trailer bed. They are not used at construction sites because they often turn over.

On cross-examination by St. Louis Slag, plaintiff stated the pictures of his whole rig after it turned over showed the fifth wheel was in a pitched-forward position.

In his complaint, plaintiff alleged St. Louis Slag was negligent because (1) it loaded the CA6 into his trailer so that it was sloped to one side, creating an unbalanced load in the trailer; and (2) it failed to warn plaintiff that the load had been loaded unevenly. St. Louis Slag alleged plaintiff was contributorily negligent. The jury returned a verdict in the total amount of $127,500 for plaintiff and determined plaintiff was 35% negligent in causing the accident. The verdict was thereby reduced to $82,875. The jury further determined M-R was 15% negligent in causing plaintiff's injuries.

St. Louis Slag first argues plaintiff wholly failed to prove the allegations in his complaint. Specifically, defendant argues plaintiff failed to prove that St. Louis Slag was negligent in not balancing the last load of CA6 it loaded for plaintiff on August 26, 1983. Defendant argues the evidence showed (1) plaintiff never looked at his load so he had no way of knowing whether it was unevenly loaded; (2) Kelsey never saw the load and stated there was no direct evidence that the load was not balanced; (3) the end loader operator concluded the last load was a good load; and (4) an unbalanced load was common in the

industry. St. Louis Slag also argues plaintiff failed to produce evidence that it had a duty to warn plaintiff of an unbalanced load.

Plaintiff argues the evidence established (1) it was custom and practice in the trucking industry for loaders of CA6 to center a load of rock in the trailer; (2) it was custom and practice in the industry for drivers to rely on loaders to center a load of rock and drivers did not always check each load; and (3) loaders watched each load they loaded to make sure it was centered and they would tell a driver when the load was off-center. Taken as a whole, plaintiff contends he presented sufficient evidence to support a jury verdict.

In its reply brief, St. Louis Slag maintains plaintiff is relying principally on Kelsey's testimony wherein he stated, *inter alia*, that there was no explanation for the accident other than an unbalanced load. Defendant argues the fact that the accident occurred is not proof that it was negligent and, therefore, the jury verdict cannot stand.

■ A jury verdict is entitled to great weight. (*Callahan v. L.G. Balfour* (1989), 179 Ill. App. 3d 372, 379, 534 N.E.2d 565, 570.) Findings of a jury cannot be disturbed by a reviewing court unless they are clearly erroneous or against the manifest weight of the evidence. (*Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 529, 504 N.E.2d 772, 775.) When considering whether a verdict is contrary to the manifest weight of the evidence, the reviewing court must view the evidence in the light most favorable to the appellee. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232, 1236.

■ To succeed in an action for negligence, a plaintiff must prove the existence of a duty owed by the defendant to the plaintiff, breach of that duty, and an injury proximately resulting from the breach. (*Aetna Insurance Co. v. Amelio Brothers Meat Co.* (1989), 182 Ill. App. 3d 863, 538 N.E.2d 707.) A duty is an obligation imposed by law upon a person which requires him to conform to a certain standard of conduct for the protection of another against an unreasonable risk. (*Johnson v. Village of Libertyville* (1986), 146 Ill. App. 3d 834, 838, 496 N.E.2d 1219, 1222.) A duty to warn against injury exists when there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm may or can occur. (*Baylie v. Swift & Co.* (1975), 27 Ill. App. 3d 1031, 1042, 327 N.E.2d 438, 447.) The existence of a duty is a question of law to be determined by the trial court. (*Rabel v. Illinois Wesleyan University* (1987), 161 Ill. App. 3d 348, 514 N.E.2d 552.) Whether a duty has been breached is a question for the trier of fact to decide. (*Dunn v. Baltimore & Ohio R.R. Co.* (1987), 162 Ill. App. 3d 97, 515 N.E.2d

1027, *aff'd in relevant part* (1989), 127 Ill. 2d 350, 537 N.E.2d 738.) A plaintiff may establish negligence using either direct or circumstantial evidence. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18, 21.) Circumstantial evidence will support a negligence finding whenever an inference may be reasonably drawn from it. *Mort*, 98 Ill. 2d at 396, 457 N.E.2d at 21.

■ We find there was sufficient evidence presented to establish St. Louis Slag breached a duty to plaintiff. Plaintiff presented evidence that an end loader operator's job is to center a load. Defendant's witnesses did not contradict this testimony. While it was established that no load of stone is ever *perfectly* balanced, the issue in this case is whether plaintiff's last load was so unbalanced as to cause his whole trailer to tip over. Plaintiff's evidence also established drivers rely on an end loader operator to tell them when a load is unbalanced and drivers cannot always tell by checking their load themselves whether it is unbalanced. This evidence supports plaintiff's allegation that St. Louis Slag failed to warn him of an unbalanced load. Further, we reject St. Louis Slag's argument that the plaintiff's proof of its negligence is premised solely on the fact that the accident occurred. We agree that the fact that an accident occurred is insufficient to raise an inference of negligence. (*Mort*, 98 Ill. 2d 391, 457 N.E.2d 18.) Here, however, plaintiff has presented other circumstantial evidence through expert testimony from which the jury could reasonably infer that an unbalanced load caused the accident to occur. The jury verdict is supported by the reasonable inferences that could be drawn from the evidence and not on speculation.

St. Louis Slag next argues the jury verdict is against the manifest weight of the evidence. Specifically, the defendant points out that the premise of plaintiff's case was that an unbalanced load caused his trailer to tip over. Defendant maintains the evidence established that no load of CA6 is ever perfectly balanced. While plaintiff testified to the contrary, defendant contends his testimony is equivocal and contradictory. Defendant maintains that if the evidence in this case supports a finding that it was negligent in loading plaintiff's load, then every truckload of CA6 is actionable because no load is perfectly balanced. The defendant argues every witness testified that the cause of the accident was the jackknife position plaintiff's rig was in when plaintiff began to unload, except Kelsey, and his testimony was not credible. Defendant maintains the manifest weight of the evidence supports a conclusion that the position of plaintiff's rig when dumping caused the accident and not an imbalance in the load.

■ A jury verdict is against the manifest weight of the evidence

only if it is wholly unwarranted by the evidence, clearly the result of passion or prejudice (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322) or where an opposite conclusion is clearly evident or the jury's findings are unreasonable, arbitrary, and not based on the evidence. (*Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 537 N.E.2d 1348.) A jury verdict cannot be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony or because the reviewing court would have reached a different conclusion if it had been the trier of fact. (*Steinberg v. Petta* (1985), 139 Ill. App. 3d 503, 487 N.E.2d 1064.) A court of review should consider not only the verdict of the jury but the fact that the trial judge also saw and heard the witnesses, heard the arguments of counsel, and then denied a post-trial motion seeking set aside of the verdict. *Berner v. Kielnik* (1983), 117 Ill. App. 3d 419, 453 N.E.2d 729.

■ Our review of the evidence in this case is in the light most favorable to the verdict (*Norvell v. Fancy Creek Township* (1985), 130 Ill. App. 3d 275, 474 N.E.2d 53), and we conclude the verdict is not contrary to the manifest weight of the evidence. Plaintiff's expert concluded the accident was likely caused by an unbalanced load. Defendant's expert stated the accident was caused by the jackknife position of the tractor and trailer and the lack of a level surface under the trailer. It was for the jury to determine the credibility of the witnesses, weigh their testimony, and resolve any conflicts in the testimony. We conclude the verdict is supported by the evidence.

St. Louis Slag next argues plaintiff's actions in dumping in a jackknife position constituted an independent, superseding cause of his injury. Plaintiff contends the physical forces which brought about his injury were placed in motion by St. Louis Slag and the dumping in a jackknife position was foreseeable and did not break the causal connection between St. Louis Slag's actions and his injuries. In its reply brief, St. Louis Slag points to plaintiff's testimony at trial where he admitted he could have refused to dump his load where, how, and when he did. St. Louis Slag contends this evidence shows conclusively that plaintiff's own actions were the sole proximate cause of his injuries.

■ Before liability for negligence can attach, a plaintiff must prove his injury was proximately caused by the defendant's breach of a duty owed to the plaintiff. (*Powell v. Star Fireworks Manufacturing Co.* (1987), 162 Ill. App. 3d 647, 515 N.E.2d 1280; *Taylor v. Gerry's Ridgewood Inc.* (1986), 141 Ill. App. 3d 780, 490 N.E.2d 987.) Proximate cause is defined as that cause which produces an injury

through a natural and continuous sequence of events unbroken by any effective intervening cause. (*Kemp v. Sisters of the Third Order of St. Francis* (1986), 143 Ill. App. 3d 360, 493 N.E.2d 372.) An intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury and itself becomes the direct and immediate cause of the injury. (*Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 380-81, 50 N.E.2d 497, 503-04.) An intervening independent action will not, however, break a causal connection between the original wrong and an injury if the intervention of the independent cause was itself reasonably foreseeable. (*Neering*, 383 Ill. at 381, 50 N.E.2d at 504; *Kirk v. Michael Reese Hospital & Medical Center* (1985), 136 Ill. App. 3d 945, 483 N.E.2d 906.) There can be more than one proximate cause of an injury. (*Bentley v. Saunemin Township* (1980), 83 Ill. 2d 10, 413 N.E.2d 1242; *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 317, 45 N.E.2d 665, 675.) To escape liability, a defendant must demonstrate that the intervening event was unforeseeable as a matter of law. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.) What constitutes the proximate cause of an injury in a particular case is ordinarily a question of fact to be determined by a jury from a consideration of all the evidence. (*Neering*, 383 Ill. at 381, 50 N.E.2d at 504.) It only becomes a question of law when the facts are not only undisputed but are such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them. *Merlo*, 381 Ill. at 318, 45 N.E.2d at 675, citing *Phillabaum v. Lake Erie & Western R.R. Co.* (1924), 315 Ill. 131, 145 N.E. 806.

▪ Viewing the evidence in a light most favorable to the plaintiff, we cannot conclude plaintiff's actions were unforeseeable as a matter of law. There was testimony that while dumping in a jackknife position was not preferable, it was done on occasion. There was also evidence that plaintiff's trailer may have tipped over due to the unbalanced load even if it had been in a straight line with the tractor. We disagree with St. Louis Slag's assertion that because plaintiff testified he could have refused to dump where, when, and how he did, this establishes plaintiff's actions were the sole cause of his injuries. Plaintiff stated he often had to dump in a jackknife position at a construction site and stated he dumped his load on this occasion after he checked the ground to make sure it was level. The jury could have found that plaintiff's injuries were proximately caused by the actions of St. Louis Slag at the quarry *and* by plaintiff's own actions at the Walmart site.

Next, St. Louis Slag contends the contribution verdict against

M-R is against the manifest weight of the evidence and requests that it be reversed or that this court order *additur*. M-R first argues St. Louis Slag waived any issue on this contribution verdict because it failed to raise this issue in its post-trial motion. On the merits, M-R contends the 15% verdict is supported by the evidence which established that while a dump master may have been able to prevent the accident, the dump master would have to be skilled enough to know what to look for. Also, the evidence that plaintiff could have refused to dump where he did supports the 15% verdict.

In its reply brief, St. Louis Slag argues the waiver rule is not applicable because it properly raised the issue in its post-trial motion.

■ We first address the waiver issue. The record shows St. Louis Slag filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for a new trial. At a hearing on this motion, counsel for St. Louis Slag's arguments for a new trial included claims that the contribution verdict against M-R should be reconsidered. We find St. Louis Slag preserved any issue on the contribution verdict in its motion for a new trial. *Carter v. Chicago & Illinois Midland Ry. Co.* (1988), 168 Ill. App. 3d 652, 656, 522 N.E.2d 856, 858.

■ ■ A verdict is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the finding of the jury appears arbitrary and unsubstantiated by the evidence. (*Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383, 1389.) Evidence was presented from which the jury could have found M-R was responsible in part for plaintiff's injuries. The precise allocation of fault among two tortfeasors is a matter upon which reasonable persons could disagree. (*Holmes*, 131 Ill. App. 3d at 674, 475 N.E.2d at 1389.) We do not find the 15% contribution verdict is contrary to the manifest weight of the evidence. In light of our conclusion, the merits of St. Louis Slag's request for *additur* relief will not be addressed. We point out, however, that *additur*, which has traditionally been limited in Illinois to rectifying the omission of a liquidated or easily calculated item of damage (*Fraher v. Inocencio* (1984), 121 Ill. App. 3d 12, 459 N.E.2d 11), would be inappropriate relief in this case.

St. Louis Slag next contends the conduct of two jurors who examined the fifth wheel of the tractor trailer outside the courtroom during a lunch break on one day of the trial was prejudicial to St. Louis Slag and the trial court erred in finding to the contrary. St. Louis Slag also argues the trial court erred in requiring it to prove prejudice when the law places the burden on the prevailing party to prove lack of prejudice from juror misconduct. Given the fact that the oper-

ation of the fifth wheel was a crucial issue in this case, St. Louis Slag asserts the jurors' actions require that a new trial be ordered.

Initially, plaintiff argues the defendant waived any claim of prejudice due to the conduct of the two jurors by failing to bring the jurors' misconduct to the trial court's attention immediately. On the merits, plaintiff maintains the trial court was correct in finding the defendant was not prejudiced by the jurors' conduct.

 We first consider the waiver argument. Following the filing of its post-trial motion, St. Louis Slag filed a supplemental post-trial motion, alleging juror misconduct during the trial prejudiced the defendant and required reversal of the jury verdict for plaintiff. Attached to the supplemental motion was an affidavit of an associate attorney with the law firm representing defendant, who was not assigned to defendant's trial. The associate stated he observed two jurors during a break in the trial on September 29, 1989, looking at the underside of a tractor trailer parked in the area outside the courtroom. The associate had been admitted to the practice of law less than one year and stated he did not realize the significance of what he saw and, therefore, did not tell anyone in his firm about the incident until two months later when he was casually discussing the matter with the defendant's trial counsel. Defendant's supplemental post-trial motion was filed two days after the juror misconduct was brought to the attention of defendant's trial counsel. At a court hearing on the supplemental post-trial motion, the trial judge concluded the defendant timely brought the misconduct issue to the court's attention and denied plaintiff's motion to dismiss the supplemental post-trial motion as untimely. We find no error in the trial court's ruling on the waiver issue and conclude *Considine v. Hill* (1959), 22 Ill. App. 2d 83, 159 N.E.2d 15, relied upon by the plaintiff, is distinguishable.

 We next consider St. Louis Slag's claim that the trial court required it to prove it was prejudiced by the jurors' conduct. Where jurors' conduct relates to a key issue in the case, prejudice to the losing party is presumed. (*Brown v. Johnson* (1981), 92 Ill. App. 3d 1095, 416 N.E.2d 799; *Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 386 N.E.2d 134.) The burden is then placed on the prevailing party to demonstrate that no injury or prejudice resulted. *Birch v. Township of Drummer* (1985), 139 Ill. App. 3d 397, 409, 487 N.E.2d 798, 807, citing *Heaver*, 68 Ill. App. 3d at 242, 386 N.E.2d at 139.

 We find the trial court correctly determined which party had the burden of proof. The record shows that at the hearing on the supplemental post-trial motion, the trial judge concluded the affidavit submitted by St. Louis Slag with its supplemental post-trial motion

showed "presumptive prejudice" to St. Louis Slag and M-R. Therefore, the trial judge ordered the two jurors to appear in court to answer questions on the matter posed by all counsel. The trial judge also stated the burden was shifted to plaintiff as prevailing party to show no prejudice was suffered by defendant as a result of the jurors' actions.

■■ St. Louis Slag argues the trial court erred in finding the jurors' conduct was not prejudicial. We disagree. Juror David Holm testified he looked at a tractor trailer during a lunch recess during the trial because he did not know what a fifth wheel was. Holm stated he and juror L. Clark Sedrick paused to look at the fifth wheel on the tractor trailer in a jackknife position outside the courtroom but he did not learn anything new from looking at it and did not talk to any of the jurors about what he saw. Holm stated the jury had not yet heard any testimony about how the fifth wheel operated. Holm stated his out-of-court observation was not significant in the later jury deliberations. Holm further testified he was not sure he even thought about his observations when the jury was deliberating. L. Clark Sedrick testified similarly. He stated he and Holm did not take notes when looking at the fifth wheel, did not talk to other jurors about what they saw, did not use anything from their observations in later deliberations, and the verdict was based solely on the evidence presented at trial. Sedrick also stated he did not see that the fifth wheel on the tractor trailer outside the courtroom was any different from the one shown to the jury by video during the trial. We agree with the trial judge that the observations by the two jurors were not prejudicial.

■■ Finally, St. Louis Slag contends the trial court erred in finding it waived an issue relating to jury instructions. St. Louis Slag argues the issue it raised in its post-trial motion concerned plaintiff's failure to *prove* St. Louis Slag owed a duty to plaintiff, not the adequacy of the jury instructions on the duty issue. St. Louis Slag argues the trial court's finding of waiver constitutes plain error.

In its post-trial motion, St. Louis Slag argued plaintiff failed to present any evidence on the duty St. Louis Slag owed to plaintiff. No issue was raised on the adequacy of the jury instructions. In his reply to St. Louis Slag's post-trial motion, plaintiff alleged, *inter alia*, that since St. Louis Slag did not object to plaintiff's instruction No. 11, which set forth the duty St. Louis Slag owed to plaintiff, St. Louis Slag waived any claim that plaintiff failed to prove the duty element of his cause of action. In the order denying the defendant's post-trial motion, the trial judge found, *inter alia*, as follows:

"A. Plaintiff presented sufficient evidence to establish the

duty owed by the Defendant to the Plaintiff;

 B. There were instructions tendered by the Plaintiff as to duty and not objected to by the Defendant, and the issue of failure to establish a duty was waived by the Defendant for failure to object to that instruction \*\*\*."

The record establishes the issues St. Louis Slag raised in its post-trial motion concerned a lack of evidence and not a deficient jury instruction. Consequently, the trial court's finding of waiver based on failure to object to jury instructions failed to address defendant's claim of error. We have already determined that plaintiff presented sufficient evidence to establish the duty St. Louis Slag owed to plaintiff. Thus, the determination of the trial court on this issue is correct. If the judgment of the trial court is correct, the reasons given in support of the judgment or findings upon which it was based are not material. (*Keck v. Keck* (1974), 56 Ill. 2d 508, 514, 309 N.E.2d 217, 220.) We conclude the trial court properly exercised its discretion in denying St. Louis Slag's request for a new trial. *Smith v. Perlmutter* (1986), 145 Ill. App. 3d 783, 785-86, 496 N.E.2d 358, 359.

For the foregoing reasons, the order of the trial court is affirmed.

Affirmed.

LUND, P.J., and SPITZ, J., concur.