Charles JONES, Plaintiff–Appellant,

v.

COLEMAN COMPANY, INCORPORATED, Dennis Aardsma, and Mary Aardsma, Defendants–Appellees.

No. 93–3480.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1994.

Decided Nov. 4, 1994.

Timothy F. Kelly, Crotty & Chacon, Chicago, IL, Harvey Karlovac (argued), Munster, IN, for Charles Jones.

C. Roy Peterson, Peter F. Higgins, Nancy Shaw (argued), Lord, Bissell & Brook, Chicago, IL, for Coleman Co., Inc.

William Cremer, Edmund J. Siegert (argued), Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Dennis Aardsma, Mary Aardsma.

Before FAIRCHILD, CUDAHY and RIPPLE, Circuit Judges.

FAIRCHILD, Circuit Judge.

Plaintiff-appellant Charles Jones ("Jones") commenced this action to recover for injuries he obtained while operating a gas-powered electrical generator.[1] The district judge granted summary judgment in favor of defendant-appellee Coleman Company, Inc. ("Coleman"), and, after appropriate consent of the parties, the magistrate judge subsequently granted summary judgment in favor of defendants-appellees Dennis and Mary Aardsma. Jones appeals.

## I. BACKGROUND

In 1990, the Aardsmas were building a home in Lansing, Illinois. They hired Scheeringa & DeVries to provide carpentry services; Jones worked for that company. At

---

1. Jurisdiction is founded on diversity. Illinois law controls all substantive issues.

the time of the incident in question, the construction site had no electricity. Mr. Aardsma borrowed a gas-powered electrical generator from his friend Roger Lange, who is in the roofing business, in order to provide electricity for the carpenters.

Prior to giving the generator to the carpenters, Mr. Aardsma used the generator for approximately fifteen minutes to power a sump pump to get water out of the basement foundation. Neither Mr. or Mrs. Aardsma had ever used a gas-powered electrical generator before.

About six days before the accident, one of the Aardsmas dropped the generator off at the construction site for the carpenters.[2] The Aardsmas supplied a five gallon gas can for refueling purposes. The Aardsmas did not discuss operation of the generator with any Scheeringa & DeVries employee, and they were not asked about its operation. They had not discussed its operation with Lange.

The carpenters used the generator to power two saws for work on the garage and upper deck of the house. Jones had done construction work for approximately five years prior to the accident. He had used gas-powered generators previously when he worked for another construction company.

Jones noticed that the generator was leaking gas two days prior to the incident, when the generator was being transported from the construction site to Wayne Scheeringa's (his boss) house in Scheeringa's van. He mentioned the leak to his boss, but nothing more was said about it. No one mentioned any problems with the generator to the Aardsmas.

Two days before the accident, Jones asked Scheeringa for a funnel. As was explained at Jones' deposition,

> Question: Had you had problems refueling the tank on the generator before Monday?
> Answer: Told him [Scheeringa] there was, you know, it was—gas was splashing and it wasn't all going into the hole.

> Question: And that was of some concern to you?
> Answer: Yes.
> Question: Why?
> Answer: I don't know, I just didn't want—didn't feel right, you know.

Aug. 14, 1992 Jones Dep. at 72. No one asked the Aardsmas for a funnel.

On May 23, 1990, the generator was fueled, used, turned off, and refueled. The generator was again used, and stopped when it ran out of gas. Jones poured gas into the gas tank, using the gas can provided by the Aardsmas. He remembers spilling gas, but not how much. The gas spilled onto the motor and the ground, and it ignited. Scheeringa saw a fifteen foot "pillar of fire." Jones was burned on his hand and legs.

The house took approximately six months to complete. Mr. Aardsma was not present when the carpenters were working. Neither Aardsma saw the carpenters use the generator, or the generator itself once the carpenters began using it, because Scheeringa took the generator home each night, to prevent theft. The Aardsmas went to the property almost every weekday evening to see how far the workers had gotten. Mr. Aardsma did not meet Jones until the evening of the accident at the hospital.

Jones sued Coleman for failure to design, manufacture and distribute a non-defective generator, for failure to provide adequate warnings, and for breach of express and implied warranties. Jones sued Briggs & Stratton Corp. for failure to design, manufacture and distribute a non-defective generator motor, and for failure to provide adequate warnings. Jones sued the Aardsmas for failure to exercise reasonable care in maintaining the property in a safe condition and for failure to exercise reasonable care in providing equipment for his use.

On January 14, 1993, Judge Conlon denied the Aardsmas' motion for leave to file their motion for summary judgment as untimely, because she had set the deadline for filing

---

2. Jones testified at his deposition that Mrs. Aardsma dropped off the generator, and that he did not meet Mr. Aardsma until the evening of the accident, at the hospital. Mr. Aardsma testified at his deposition that he dropped off the generator, and Mrs. Aardsma testified that she did not drop off the generator.

dispositive motions for December 16. On January 19, 1993, Judge Conlon granted Coleman's motion for summary judgment. In February, the parties consented to proceed before a magistrate judge. After Briggs & Stratton settled with Jones, the Aardsmas were the only remaining defendants. They again sought leave to file a motion for summary judgment, which Magistrate Judge Guzman allowed. The magistrate judge subsequently granted the Aardsmas' motion for summary judgment.

## II. DISCUSSION

### A. Estoppel to Deny Manufacture of Generator

■ In response to Jones' allegation that "[i]n May, 1990, Dennis Aardsma and Mary Aardsma rented a generator designed, manufactured and distributed by Coleman Co., Inc.," Am.Compl. ¶ 5, Coleman responded that it "has no knowledge sufficient to form a belief as to the truth or falsity of the allegations that Dennis Aardsma and Mary Aardsma rented a generator and defendant denies every remaining allegation of paragraph 5." Sept. 29, 1992 Answer to Am.Compl. ¶ 5.[3] Coleman denied Jones' allegations that Coleman owed him a duty to manufacture a non-defective generator and provide adequate warnings. Id. ¶ 18. It also denied that it had given Jones implied and express warranties, and had breached those warranties. Id. ¶¶ 21–22, 24–25.

On December 3, Coleman filed a motion for summary judgment, and identified the correct manufacturer as Coleman Powermate, Inc. Coleman attached as an exhibit an affidavit by Jim Dixon, the Director of Quality and Warranty Operations at Coleman Powermate. Dixon inspected the generator on August 6, 1992, and concluded that Coleman Powermate manufactured it.[4] He also states in his affidavit that he is familiar with

Coleman, and that it does not manufacture generators.

Jones argues that Coleman is estopped from denying that it manufactured the generator, because Coleman misled Jones to believe that Coleman manufactured the generator until after the statute of limitations had expired. He contends that Coleman took an active role in the litigation. He also asserts that Coleman and Coleman Powermate are closely related (but does not elaborate on this relationship), and that Coleman simply waited too long to bring out the fact that it did not manufacture the generator. He concludes that Coleman should not be rewarded for defending the interests of a related corporation.

Jones asserts that "Coleman obviously knew from the beginning that it did not manufacture electrical generators, defective or not. (Answer to Complaint ... and Affidavit of Jim Dixon....)." Reply Br. at 2. Jones' citations to the record, however, only partially support his assertion.[5]

The most troubling aspect of Coleman's treatment of this case is that it devotes a portion of its brief to this court to the argument that the district court properly denied Jones' motion for leave to amend his complaint to name Coleman Powermate as a defendant (motion discussed below). We do not understand why Coleman would have any interest in opposing a motion to substitute Coleman Powermate as defendant-manufacturer, or in arguing that the amendment can not relate back to the filing of Jones' original complaint.

While some of the circumstances surrounding Coleman's actions are questionable, to say the least, Jones does not point to any case law which would support a conclusion that Coleman, which denied in its answer that it designed, manufactured or distributed the generator, and in fact did not do so, can now be held liable for Jones' injuries.

3. In its brief, Coleman inaccurately states that it "generally denied that it designed, manufactured and distributed the generator, by specifically stating that 'it has no knowledge sufficient to form a belief as to the truth or falsity of the allegations' that it designed, manufactured and distributed the generator." Coleman Br. at 10.

4. Dixon's affidavit does not indicate at whose request Dixon conducted the inspection.

5. Nothing in the record shows that Coleman had never been in the business of manufacturing generators.

## B. Motion to Amend Complaint

■ Jones argues that Judge Conlon erred when she denied his motion for leave to amend his complaint to substitute Coleman Powermate for Coleman, and that the amendment relate back to the filing of his original complaint. If the amendment does not relate back, Jones' action against Coleman Powermate is barred by the statute of limitations.

Rule 15(c) of the Federal Rules of Civil Procedure provides that

An Amendment of a pleading relates back to the date of the original pleading when

. . . .

within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Jones contends that Coleman Powermate knew of his lawsuit at the latest at the time its employee Jim Dixon inspected the generator (August 6, 1992), and that it had "constructive knowledge" because of its close relationship with Coleman. Again, Jones gives no hint of the nature of any relationship, other than similarity of name.

There is surely enough in the record to show that Coleman Powermate was the manufacturer, rather than Coleman. But for the running of the period of limitations and the question whether relation back is appropriate, leave to substitute Coleman Powermate would have been "freely given when justice so requires." Fed.R.Civ.P. 15(a). As a general proposition, it is more logical to look to Coleman Powermate than to Coleman to decide whether to plead the defense of limitations and whether to challenge the propriety of relation back.

Dixon, Coleman Powermate's "Director of Quality and Warranty Operations," inspected the generator and concluded that it was man-

ufactured by Coleman Powermate, within the 120 days provided for in Rule 4(m). We know of no reason why Dixon's knowledge at that date would not be imputed to his employer. Whether that knowledge fulfilled the notice and knowledge requirements of subdivisions (A) and (B) of Rule 15(c)(3) may be open to question, but we think that the fact of Dixon's knowledge is a sufficient showing so that it was an abuse of discretion not to permit Coleman Powermate to be made a defendant. Once before the court, Coleman Powermate would have the opportunity to show that the requirements of subdivisions (A) and (B) had not been fulfilled.

## C. Leave to File Summary Judgment Motion

■ After the dispositive motion deadline had passed, Judge Conlon rejected the Aardsmas' motion for leave to file a motion for summary judgment as untimely, and denied their motion for reconsideration. Subsequently, the parties consented to proceed before Magistrate Judge Guzman, who granted the Aardsmas leave to file their summary judgment motion.

Jones argues that Magistrate Judge Guzman abused his discretion because he did not have good cause to reverse Judge Conlon's previous decision to deny leave to file, relying on the final sentence of Rule 16(b) of the Federal Rules of Civil Procedure ("A schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge."). We find, however, that the change in circumstances whereby the issues involving the only remaining defendant are addressed by the motion, constituted "good cause" to allow the Aardsmas to file their motion for summary judgment.

A district court has discretion in managing its caseload. Here, there was no decision on the merits by Judge Conlon; she merely rejected the Aardsmas' motion for leave to file as untimely. During oral argument, Jones' attorney conceded that Judge Conlon, had she remained the presiding judge, would be free to revisit the issue as to whether the Aardsmas should be permitted to file their summary judgment motion. But Jones

would have us focus on his belief that there is no indication that Judge Conlon would have changed her ruling.

The magistrate judge was the presiding judge at the time he acted, in his discretion, to allow the Aardsmas to file their motion for summary judgment. Similar situations frequently arise when an action is transferred from one judge to another. And, given the fact that (as we conclude in the following sections) the magistrate judge appropriately granted the Aardsmas' motion for summary judgment, judicial economy was served. To find that the magistrate judge erred would inappropriately infringe on his power to control the proceedings in his court.

### D. Duty of Reasonable Care

■ Jones asserts that the Aardsmas should have known the generator was unreasonably dangerous, were in the best position to obtain information on the safe operation of the generator, and were under a duty to inquire about the safe use of the generator and inform Jones of its proper use.

Section 388 of the Restatement (Second) of Torts ("Chattel Known to be Dangerous for Intended Use") provides

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Illinois follows § 388 with respect to determining whether a duty to warn exists. *Quinton v. Kuffer*, 221 Ill.App.3d 466, 164 Ill.Dec. 88, 582 N.E.2d 296 (1991) (plaintiff (a welder), in making a stove out of a drum for defendant (a carpenter), used a torch on the drum, which caused an explosion; defendant, who had seen a label marked "flammable" on the drum, owed no duty to warn plaintiff) ("Although plaintiff did not recall if the drum had a label, defendant could reasonably expect that plaintiff would realize any danger in cutting into the drum with a torch and make inspection of the drum for any dangerous condition attendant in the welding operations in which he was experienced." *Id.* at 93, 582 N.E.2d at 301); *see also Durbin v. St. Louis Slag Products Co.*, 206 Ill.App.3d 340, 151 Ill.Dec. 265, 564 N.E.2d 242 (1990) (evidence supported jury verdict that defendant, owner of a quarry, breached duty to warn plaintiff, a driver who received a dump trailer of rock from the quarry, that he had an unbalanced load, which resulted in the trailer crushing the truck cab and injuring plaintiff) ("A duty to warn against injury exists when there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm may or can occur." *Id.* at 274, 564 N.E.2d at 251); *Vallejo v. Mercado*, 220 Ill.App.3d 1, 162 Ill.Dec. 692, 580 N.E.2d 655 (1991) (plaintiff, who had never used a chain saw before, was injured by chain saw kickback; "defendant had duty to warn plaintiff of any dangers which were not open and obvious and of which defendant was aware" *Id.* at 700, 580 N.E.2d at 663).

There is no evidence that the Aardsmas knew (or had reason to know) that the generator presented any danger not inherent in any use of gasoline; when Mr. Aardsma operated the generator to power the sump pump he noticed no problems and no one brought any problems to the Aardsmas' attention. No one requested an operation manual or additional equipment (*i.e.* a funnel) from the Aardsmas. The Aardsmas borrowed the generator in order to lend it to Scheeringa; they could reasonably expect that it would be used by his knowledgeable workers. There is no indication that the Aardsmas knew that Jones would not realize a danger of which the Aardsmas knew; Jones had used similar generators before. The Aardsmas had no greater knowledge of

danger than Jones. Jones therefore states no cause of action against the Aardsmas under § 388.

### E. Control of the Construction Site

 Jones argues that the Aardsmas had the ability to exercise control over the construction site, and therefore are liable for providing the generator for his use. He asserts that they acted as general contractors, and cites evidence of control such as their selection of Scheeringa & DeVries and daily inspection of the site.

Section 414 of the Restatement (Second) of Torts ("Negligence in Exercising Control Retained by Employer") provides

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Comment c to § 414 states that "[i]n order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports...." To be liable, the Aardsmas must have supervised Jones so that he was "not entirely free to do the work in his own way." *Bezan v. Chrysler Motors Corporation*, 263 Ill.App.3d 858, 201 Ill.Dec. 647, 651, 636 N.E.2d 1079, 1083 (1994). "[T]he duty to exercise control with reasonable care is not assumed merely from landowner status." *Burger v. Prairie Development, Ltd.*, 218 Ill.App.3d 814, 161 Ill.Dec. 467, 475, 578 N.E.2d 1113, 1121 (1991).

There is no evidence that the Aardsmas controlled the manner in which Jones performed his work; any control was only to the extent that they chose his employer to perform carpentry work. The Aardsmas were never present when Jones was on the job. Nor is there evidence that the Aardsmas knew that Jones was working in a potentially hazardous manner. Jones has failed to present facts sufficient to establish a duty of the Aardsmas owed to Jones under § 414.

Insofar as the district court denied Jones' motion for leave to file an amended complaint to substitute Coleman Powermate for Coleman, that denial is REVERSED and the cause is REMANDED with instructions to permit such amendment. After service has been effected on Coleman Powermate, Coleman Powermate will be free to raise the question of whether the amendment can relate back to the original filing of Jones' complaint. In all other respects, the judgments below are AFFIRMED. Each party will bear his or its own costs of appeal.